IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:23-CR-243-ALM-AGD |
| | § | Judge Mazzant |
| LASHONDA MOORE (01) | § | |
| | § | |
| | § | |

## UNITED STATES' SENTENCING POSITION FOR DEFENDANT LASHONDA MOORE

Defendant LaShonda Moore is an unapologetic fraudster driven by greed, power, and fame. Together with Marlon Moore, her husband and co-defendant, LaShonda Moore orchestrated and directed a scheme to defraud more than 12,000 victims of millions of dollars for the Moores' personal gain. From June 2020 to February 2021, at the peak of the COVID-19 pandemic, the Moores preyed on vulnerable Americans who were struggling to make ends meet during a period of unprecedented economic disruption. The Moores live-streamed weekly online videos to thousands of victims to promote "Blessings in No Time" or "BINT," their chain referral pyramid scheme. The Moores falsely promised "guaranteed," high-yield profits of 800% on a risk-free investment of $1,400. Leveraging their T.V. celebrity fame, the Moores relied on religious terminology and a shared affinity group—victims' $1,400 payments were "blessings" to other African Americans, the exclusive members of the BINT "community"—to gain their victims' trust. The Moores knowingly obscured that their fraudulent scheme was illegal and would one day collapse so that they could attract thousands of victims, most of whom were struggling with their day-

to-day finances during the COVID-19 lockdown. Even when it was obvious that the pyramid scheme was collapsing, the Moores continued to lie to victims who demanded the "guaranteed" refunds. Rather than trying to help, the Moores gaslit anyone who questioned them while they continued to defraud more victims. As the scheme was failing, the Moores spent the proceeds of their fraud on a luxury destination vacation for more than 25 family members and friends, a lavish birthday party for LaShonda, and a single payment of $446,761.74 to pay off their home mortgage.

Defendant LaShonda Moore has pleaded guilty to one count of money laundering in violation of 18 U.S.C. § 1957. The Presentence Investigation Report ("PSR") calculated a total offense level of 42[1] and a Criminal History Category I, resulting in an advisory Guidelines range of 360 months to life. (ECF 118 at ¶ 79.) The government respectfully submits that the Court should sentence LaShonda Moore to the statutory maximum sentence of 120 months' imprisonment.

---

[1] The PSR offense level calculation includes a 3-level enhancement for defendant intentionally selecting victims based on their race or color under U.S.S.G. § 3A1.1(a). To apply this enhancement, the Court must make a finding of fact *beyond a reasonable doubt*. In the interest of conserving judicial resources given the offense level calculation and statutory maximum sentence, the government does not intend to call witnesses or submit additional evidence in support of a 3-level enhancement under U.S.S.G. § 3A1.1(a) beyond what is stated in the PSR (to which neither party has objected).

## TABLE OF CONTENTS

I.    RELEVANT PROCEDURAL HISTORY ....................................................................... 4

II.   THE OFFENSE CONDUCT ....................................................................................... 5

III.  ADVISORY SENTENCING GUIDELINES ........................................................ 8

   A.   The PSR Correctly Applied a 20-Level Enhancement for Loss ........................... 10

   B.   The PSR Correctly Applied a 6-Level Enhancement for 25 or More Victims with Substantial Financial Hardship ....................................................................... 12

   C.   The PSR Correctly Applied a 2-Level Enhancement for Sophisticated Means and a 4-Level Enhancement For Organizer or Leader of Criminal Activity that was Otherwise Extensive ......................................................................................... 13

   D.   The Court May Find Beyond a Reasonable Doubt that the 3-Level Enhancement Applies for Intentionally Selecting Victims Based on Race and Color ...................... 14

IV.   GOVERNMENT'S SENTENCING RECOMMENDATION ............................. 16

   A.   Term of Custody ................................................................................. 17

      1.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)) ............................................................. 18

      2.   Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A)) ....................................................................... 19

      3.   Affording Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant (18 U.S.C. § 3553(a)(2)(B) and (C)) ............................................ 20

   B.   Supervised Release, Fine, Restitution, Forfeiture, and Mandatory Special Assessment ............................................................................................ 21

V.    CONCLUSION ............................................................................................ 22

## I.  RELEVANT PROCEDURAL HISTORY

On November 8, 2023, defendants LaShonda Moore and Marlon Moore (collectively, "defendants") were indicted on nine felony counts for wire fraud conspiracy (18 U.S.C. § 1349), wire fraud (18 U.S.C. § 1343), and money laundering (18 U.S.C. § 1957).  (ECF 1.)  The indictment alleged that the Moores ran the illegal BINT pyramid scheme from defendants' home in Prosper, Texas.  *Id.*  On January 16, 2025, defendants each pleaded guilty to Count 9 of the Indictment (18 U.S.C. § 1957) pursuant to written plea agreements with the government, which are not binding on the Court.  (ECFs 51 & 55.)  On January 23, 2025, the Court accepted each defendant's guilty plea to Count 9 of the Indictment and deferred acceptance of the plea agreements until after review of the presentence reports.  (ECFs 60 & 61.)

On March 27, 2025, defendants were arrested pursuant to allegations of violating conditions of pre-trial release.  (ECF 90.)  On April 2, 2025, Magistrate Judge Aileen Goldman Durrett ordered defendants remanded into custody for violating conditions of release, and she conducted a *Faretta* hearing as to both defendants and found that each defendant knowingly and voluntarily waived their right to counsel and should be permitted to proceed *pro se*.  (ECF 94 & 95.)

On July 31, 2025, the U.S. Probation Office ("USPO") filed the Initial Disclosure Copy of the Presentence Report for LaShonda Moore.  (ECF 106.).  On August 25, 2025, the Court granted LaShonda Moore's motion (filed by standby counsel) for an extension of time to file objections to the Presentence Report until September 22, 2025.  (ECF 108 &

109.)  Having received no objections from LaShonda Moore or the government, the USPO filed the Final Presentence Investigation Report for LaShonda Moore on September 23, 2025.  (ECF 118 (hereinafter "PSR").)  The sentencing hearing for LaShonda Moore is currently scheduled for September 30, 2025.

## II.    THE OFFENSE CONDUCT

From June 2020 to February 2021, defendants conspired to create and run an illegal pyramid scheme called "Blessings in No Time" or "BINT."  (*See* ECF 53 at ¶ 3.)  BINT was a fraudulent chain-referral pyramid scheme that targeted victims with false and misleading statements and false promises regarding high-yield returns of 800% and no-risk, guaranteed refunds. (*Id.* at ¶ 4.)  Defendants structured BINT



so that it operated on "playing boards" that had four levels: Fire, Wind, Earth, and Water. (*Id.* at ¶ 5.)  Each playing board had eight Fire positions on the outside, four Wind positions closer in, two Earth positions next to the center, and one Water position at the center.  (*Id.*) Each BINT participant started in the scheme as a Fire on a board assigned to them.  The Fires were directed to "bless" or pay the Water either $1400 or $1425, so that the Water received $11,200 or $11,400 in total.  (*Id.*)

Once all Fires paid the Water, then the board split into two, and every Fire moved into a Wind position.  Every Wind then had to recruit two new Fires, and, once the new

Fires made their payments, the board split again and the Winds moved up to an Earth on their respective new boards. (*Id.*)



Defendants instructed participants in the "Fire" positions to make payments of $1,400 or $1,425 to participants in the "Water" position using peer-to-peer smartphone payment applications such as CashApp, Venmo, PayPal, and Zelle. (*See* PSR at ¶¶ 22 & 39.) Beginning in August 2020, defendants required BINT participants to pay $85 per month to use an online web platform (called "Conecmi") to populate playing boards, coordinate payments between Fires and Waters, and to facilitate the splitting of boards. (ECF 53 at ¶ 8.)

From at least June through November 2020, defendants hosted regular live-streamed video updates for all BINT participants. The weekly live-stream sessions would regularly host more than 1,000 viewing participants from across the United States. (PSR at ¶ 20.) During the live-stream videos, which typically lasted an hour or more, defendants would promote the BINT community to existing and prospective participants. (PSR at ¶ 16.) Defendants encouraged new participants (*i.e.*, "Fires") to promptly make their $1,400 or

$1,425 "blessing" payment to the designated person in the Water position on their board, and defendants encouraged participants to recruit new participants exclusively from the "black community" to be Fires.  (PSR at ¶¶ 14 & 17.)

Defendants made repeated false and fraudulent statements to prospective and existing BINT participants about the nature of BINT.  For example, defendants promised participants "guaranteed" 800% returns on their $1,400 or $1,425 investment.  (PSR at ¶¶ 29-32.)  Defendants also fraudulently lulled victims into a sense of security and trust by falsely promising guaranteed refunds to any participant who was dissatisfied with the performance of their investments.  (PSR at ¶ 16.)  Defendants knew, however, that they were in fact operating an illegal pyramid scheme and that their promises of guaranteed profits and refunds were false.  (PSR ¶ 27.)

In less than a year, defendants recruited more than 12,000 victims to pay into the BINT pyramid scheme. (PSR ¶ 26.)  According to defendants' own statements in one weekly video broadcast, more than $31 million in "blessing" payments had been made to members of the BINT community.  (PSR ¶ 14(i).)  More than $31 million is consistent with 12,000 BINT participants each making 1.8 payments (on average) of $1,400.  Numerous victims reported making multiple payments of $1,400 or $1,425.  (*See* PSR at ¶¶ 33(c), (d), (g), (j), (l), (r), (t), (u), (x), (bb) & (cc).)  Many other victims reported investing more than $10,000.  (PSR at ¶¶ 33(f), (n), (o), (v), (y), (dd) & (ff).)  Chain-referral pyramid schemes, like BINT, "inevitably collapse as a matter of mathematical operation" because they rely on exponentially adding new participants to pay for earlier-in-time participants.  (PSR at ¶ 25.)

In a pyramid scheme like BINT, in which new participants must make a standardized payment amount and recruit two new participants to also make standardized payments, at any one time 88% of victims will be in a loss position (*i.e.*, having paid in but received nothing). (*Id.*) This percentage of victims in the loss position never goes down because the scheme can only continue if more victims are recruited to join.

## III.    ADVISORY SENTENCING GUIDELINES

Pursuant to the plea agreement, LaShonda Moore pleaded guilty to one count of money laundering in violation of 18 U.S.C. § 1957 (Count 9). (ECF 51.) As part of the plea agreement, the parties agreed that the following sentencing factors would apply:

(i.)    The applicable base offense level calculation is calculated under U.S.S.G. § 2S1.1(a)(1), which includes that the underlying offense is calculated under U.S.S.G. § 2B1.1(a)(2) resulting in a base offense level of 6;                                                                                      +6

(ii.)    Defendant was convicted of violating 18 U.S.C. § 1957, resulting in a 1-level increase in offense level under U.S.S.G. § 2S1.1(b)(2)(A).                                                          +1

In addition to the plea agreement, the USPO's Guidelines calculations applied a Criminal History Category I and included the following enhancements:

(iii.)    The loss was more than $9,500,000 but less than $25,000,000 under U.S.S.G. § 2B1.1(b)(1)(K) resulting in a 20-level increase in offense level;                                              +20

(iv.)    The offense resulted in substantial financial hardship to 25 or more victims under U.S.S.G. § 2B1.1(b)(2)(C) resulting in a 6-level increase in offense level;                                              +6

| | | |
|---|---|---|
| (v.) | The offense involved sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C) resulting in a 2-level increase in offense level; | +2 |
| (vi.) | The defendant intentionally selected victims as the object of the offense of conviction because of the actual or perceived race or color a person resulting in a 3-level increase in offense level under U.S.S.G. § 3A1.1(a); | +3 |
| (vii.) | Defendant was an organizer or leader of a criminal activity that was otherwise extensive resulting in a 4-level increase in offense level under U.S.S.G. § 3B1.1(a); and | +4 |
| (viii.) | Defendant has not demonstrated acceptance of responsibility for the offense and therefore is not eligible for reduction in offense level under U.S.S.G. § 3E1.1. | +0 |
| | **Total:** | **42** |

Defendant LaShonda Moore has not objected to any of the findings in the PSR. In making factual determinations at sentencing, the Court is entitled to rely upon the information in the PSR as long as the information bears some indicia of reliability. *United States v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010) (citing *United States v. Shipley*, 963 F.2d 56, 59 (5th Cir.1992)). Defendant bears the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue. *Scher*, 601 F.3d at 413 (citing *United States v. Washington*, 480 F.3d 309, 320 (5th Cir.2007)).

For the reasons stated below, the Court should adopt the findings in the PSR and apply the resulting offense level increase for each enhancement listed in the PSR (other than for the 3-level increase for intentionally selecting victims based on their race or color

under U.S.S.G. § 3A1.1(a), which requires the Court to make a finding beyond a reasonable doubt[2].)

### A.  The PSR Correctly Applied a 20-Level Enhancement for Loss

The PSR correctly applied a 20-level enhancement for a total loss of more than $9,500,000.[3]    As detailed in the United States' Sentencing Memorandum Regarding Restitution (ECF 116), the government has submitted (for restitution purposes) the names and addresses of 11,915 victims for which the government has both (1) a mailing address, and (2) documented payment amounts into the BINT scheme from that victim.  For victims meeting both criteria, the government seeks restitution in the amount of $4,323,106.89 for victims' actual losses that can be documented.  (*Id.*)  This $4.3 million restitution amount alone establishes a loss of more than $3,500,000 but less than $9,500,000 under U.S.S.G. § 2B1.1(b)(1)(J) resulting in an 18-level increase.  But this drastically undercounts the total amount of victim losses.

Thus, the PSR is correct in assessing a 20-level increase under U.S.S.G. § 2B1.1(b)(1)(K) because the loss amount is more than $9,500,000.  The PSR uses a

---

[2] For this sentencing adjustment (based on characteristics of the victim) to apply in the case of a plea of guilty, the Court at sentencing must first determine beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person. U.S.S.G. § 3A1.1(a).

[3] The amount of loss is a factual finding which need only be found by a preponderance of the evidence. *United States v. Simpson*, 741 F.3d 539, 556–57 (5th Cir. 2014). The Court "need only make a reasonable estimate of the loss." USSG § 2B1.1, cmt. n. 3(C).

conservative method to calculate the loss amount for purposes of the Advisory Guidelines. First, even though approximately 12,000 victims made $85/monthly payments totaling more than $3.6 million (all of which constitutes victim loss), the PSR only includes in its calculation the portion of the $3.6 million paid directly to defendants ($1,020,000).  (PSR at ¶ 26.; *see also* ECF 116.)

Second, although the government has identified 11,915 victims for purposes of restitution, the PSR calculates loss based on only 8,000 victims.  (PSR at ¶ 26.) The PSR relies on defendants' own statements—from mid-way through the scheme—during their weekly video broadcasts that BINT had more than 8,000 members. (PSR at ¶ 18.)  And the PSR calculates that the 8,000 members each made only one payment of $1,400. (PSR at ¶ 26) (Even though, based on victim statements and financial records, innumerable victims made multiple payments each, and many made the higher payment amount of $1,425.)

Thus, the PSR's very conservative calculation of loss included (i) 8,000 participants multiplied by $1,400, equaling $11,200,000; (ii) plus $1,020,000 for $85/month fees; and (iii) multiplied by 88% to only account for participants in the loss position (based on the expert testimony that 88% of pyramid scheme participants are always in the loss position). (PSR at ¶¶ 25-26.)  Even with all of these inferences construed in defendant's favor,[4] the

---

[4] Notably, findings in the PSR alternatively support a 22-level increase for loss based on defendants' claims during their weekly video broadcasts that more than $31 million had been paid to BINT participants in the Water position.  Had the PSR used this amount (applying the 88% multiple) to calculate loss, the result would have been a victim loss amount of $27,278,000, which is a 22-level increase under U.S.S.G.  § 2B1.1(b)(1)(L). Nevertheless, the government supports the PSR's more conservative calculation of a 20-level increase.

PSR calculates the loss amount to be at least $10,753,600, which supports a 20-level increase under U.S.S.G. § 2B1.1(b)(1)(K).

### B. The PSR Correctly Applied a 6-Level Enhancement for 25 or More Victims with Substantial Financial Hardship

The PSR correctly applied a 6-level enhancement because LaShonda Moore's offense resulted in substantial financial hardship to 25 or more victims. U.S.S.G. § 2B1.1(b)(2)(C). The PSR states that at least 32 victims reported suffering substantial financial hardship. (PSR at ¶¶ 33(a) – 33(ff).) These victims, primarily via victim impact statements submitted to the government and provided to USPO and defendant, reported financial hardships as a result of investing in BINT that included: (1) becoming insolvent (*id*. at ¶¶ 33(g), (l) & (p)); (2) filing for bankruptcy (*id*. at ¶ 33(o)); (3) substantial losses to retirement funds (*id*. at ¶¶ 33(f), (g), (h), (x), and (dd)); (4) substantial changes to employment by taking on a second job (*id*. at ¶¶ 33(o) & (q)); (5) substantial changes to living arrangements (*id*. at ¶¶ 33(r) & (cc)); and (6) substantial harm to and ability to obtain credit (*id*. at ¶¶ 33(b), (h), (i), (o), (p), (q), (r) & (s)).[5]

---

[5] In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit. U.S.S.G. § 2B1.1, Application Note 4(F).

**C. The PSR Correctly Applied a 2-Level Enhancement for Sophisticated Means and a 4-Level Enhancement For Organizer or Leader of Criminal Activity that was Otherwise Extensive**

The PSR correctly applied a 2-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C).  To carryout the fraudulent scheme, defendants (i) developed a website (BintApp.com) (PSR at ¶ 20); (ii) contracted with a third-party to develop a web-based payment tracking system (Conecmi) (*id.*); (iii) used a credit card payment processing platform to charge monthly fees (ThriveCart) (*id.*); (iv) hosted weekly videos live-streamed to thousands of BINT victims across the United States (Band App) (*id.*); and (v) employed an 11- to 20-member Admin team to track BINT participants' payments and to coax BINT participants into making their $1,400 payments (*id.* at ¶ 23).  Within an eight-month period, BINT had grown to more than 12,000 participants and inflicted tens of millions of dollars in victim losses.

Similarly, the PSR correctly applied a 4-level enhancement for leader or organizer of criminal activity that was otherwise extensive under U.S.S.G. § 3B1.1(a).  In assessing whether a defendant is an organizer or leader of criminal activity, the Court should consider factors that include (i) the exercise of decision-making authority, (ii) the nature of participation in the commission of the offense, (iii) the recruitment of accomplices, (iv) the claimed right to a larger share of the fruits of the crime, (v) the degree of participation in planning or organizing the offense, (iv) the nature and scope of the illegal activity, and (vii) the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1 App. Note 4.  In all respects, LaShonda Moore and her co-defendant, Marlon Moore, exercised

decision making authority and control over the BINT enterprise, including controlling the finances, directing employees, and determining who would receive the $11,200 or $11,400 Water blessing payments (or capriciously deny such payments when owed).

### D. The Court May Find Beyond a Reasonable Doubt that the 3-Level Enhancement Applies for Intentionally Selecting Victims Based on Race and Color

The PSR provides a sufficient factual basis for the Court to find beyond a reasonable doubt that defendant intentionally selected victims because of their actual or perceived race or color, and therefore, determine that the 3-level increase under U.S.S.G. § 3A1.1(a) applies. *See United States v. Horsting*, 204 F. App'x 441, 444 (5th Cir. 2006) (in reviewing a sentencing from a guilty plea, the Fifth Circuit affirmed the district court's finding that defendant's crime was racially motivated beyond a reasonable doubt because the finding was plausible in light of the record as a whole); *see also United States v. Wolfe*, 2022 WL 17609467, at *7 (6th Cir. Dec. 13, 2022) (affirming the district court's adoption of the PSR's findings as a basis for the court to conclude defendant "selected his victims based on their race, religion, and/or ethnicity beyond a reasonable doubt").

As provided in the PSR findings based on the investigative record, LaShonda Moore targeted victims because of their perceived race or color. Specifically, BINT was promoted as an "all-black group." (PSR at ¶ 14.i.)  A key piece of defendants' affinity fraud scheme involved enticing victims who believed that they were promoting wealth and prosperity for their affinity group—the African-American community.  For example, part of defendants' initial pitch to prospective BINT participants stated that BINT only admitted

African Americans to the BINT community during the pandemic as a means to financially advance African Americans.  (*Id*. at ¶ 15.)

Defendants made repeated statements on their weekly live-stream video casts that encouraged participants to solicit other African Americans participants to join BINT and to entice victims through trust in their own affinity group.  Such statements included:

"BINT is still a black community." (*Id*. at ¶ 14.i.)

"Everybody wants to know how do we make sure that white people don't come inside the [BINT] community. Everybody wants to know that. Guys…just because we're doing an automated call now, we still have our screening process. So trust me, they [white people] will not be in here, all right?" (*Id*. at ¶ 14.iii.)

"If you want to come to an all-black group, understand this is our culture." (*Id*. at ¶ 14.i.)

"This is still a black community." (*Id*. at ¶ 14.i.)

"We will always be a black community." (*Id*. at ¶ 14.ii.)

"And guess what, moving forward BINT will forever…will forever…be an all-black group." (*Id*. at ¶ 14.i.)

"Make sure you're inviting the right type of people." (*Id*. at ¶ 14.iii.)

"Make sure you are staying true to that ABC [All Black Culture] culture, okay?" (*Id*. at ¶ 14.iii.)

"Do you know that two of the main things…do y'all understand how big we would be if one, we, allowed y'all to talk about this on social media; and two, if we allowed white

folks in here and other, not just white, white, Dominican, Hispanic, like all the other stuff? We are going to keep it private because it's going to be specifically for us. We want to get rid of all the other stuff. If you want to come to an all-black group, understand this is our culture." (*Id*. at ¶ 14.iii.)

"I like my black people; I want this to stay all black." (*Id*. at ¶ 14.i.)

"The first $31 million in this community went to the black individual." (*Id*. at ¶ 14.i.)

Based on defendant LaShonda Moore's own words, and the words of her husband and co-conspirator, during the weekly live-stream videos broadcast to thousands of victims, the Moores used BINT to specifically target victims based on their perceived race or color. This provides a sufficient factual basis for the Court to find beyond a reasonable doubt that defendant LaShonda Moore intentionally selected victims based on their actual or perceived race or color and may apply the 3-level enhancement under U.S.S.G. § 3A1.1(a).

## IV.    GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a). *United States v. Rita*, 551 U.S. 338, 348 (2007). Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id*. at 350.

Under 18 U.S.C. § 3553(a)(1), the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. Furthermore, the Court should consider the need for the sentence imposed to: (i) reflect the

seriousness of the offense, (ii) promote respect for the law, (iii) provide just punishment, (iv) afford adequate deterrence, (v) protect the public, and (vi) avoid unwarranted sentence disparities. (18 U.S.C. § 3553(a)(2) and (6).)

### A. Term of Custody

Considering the relevant 18 U.S.C. § 3553(a) factors, a sentence of 120 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

In addition, the government notes that defendants' plea agreements contain a provision stating that if both defendants comply with the terms of their respective plea agreements, then the government would recommend that the Court sentence each defendant to staggered terms of incarceration[6] (but acknowledges the Court retains full discretion on whether or not to order staggered terms of incarceration). (ECF 51 at ¶ 11.a; ECF 55 at ¶ 11.a.) The government, however, cannot at this time recommend defendants be sentenced to staggered terms of incarceration. First, LaShonda Moore has not complied with a predicate condition of her plea agreement that obligates her to submit to interviews by USPO regarding her capacity to satisfy fines or restitution. (ECF 51 at ¶ 10.) Specifically, the PSR found that LaShonda Moore "has not cooperated" with USPO's investigation into defendant's ability to pay a fine or restitution. (PSR at ¶ 67.) In addition, following the revocation and remand into custody of defendants on a motion by Pretrial

---

[6] The government understands that defendants have a child between the age of one and two years old, which was the impetus for the government considering recommending staggered terms of incarceration for defendants.

Services, and Magistrate Judge Durrett's findings at the bond revocation hearing, defendants have demonstrated that they are unwilling and unable to comply with basic conditions of release.

### 1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The nature and circumstances of the offense, including LaShonda Moore's history and characteristics, weigh heavily in favor of a significant sentence of imprisonment.  At the peak of the COVID-19 pandemic, LaShonda Moore preyed on vulnerable Americans who were struggling to make ends meet during a period of unprecedented economic disruption.  Moore used BINT to falsely dangle the promise of wealth and financial security for the victims, and for the victims' community.  Sadly, LaShonda Moore's false promises proved irresistible to far too many working Americans struggling with their finances during unprecedented layoffs and economic uncertainty, which hit the African American community particularly hard.  LaShonda Moore preyed on victims' fears and anxiety so that she could steal their savings, their retirement funds, and money for their children and grandchildren.

When BINT began to collapse in November 2021, LaShonda and Marlon Moore told their victims not to worry.  The Moores lied again about the legitimacy of BINT, falsely promised refunds to those who insisted that they wanted out, and attempted to lull the remaining victims into staying with BINT.  But rather than paying the promised refunds, the Moores spent $20,000 of victims' money on a surprise birthday party for LaShonda, and then the couple used victim money to fly more than 25 of their closest

friends and family for a getaway vacation to Cabo San Lucas, Mexico.  (PSR at ¶ 29.)  Near the very end, the Moores wired $446,761.74 of fraudulent proceeds to pay off their mortgage.  At the same time, the Moores' scheme inflicted substantial financial hardship on dozens of people who were struggling to pay for basic living expenses.  (PSR at ¶ 33.)

### 2. Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A))

A custodial sentence is needed in this case to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  The scope of LaShonda Moore's conduct makes plain the seriousness of the offense.  The context in which the fraudulent scheme was carried out only underscores the gravity of the offense. During the onset of the COVID-19 lockdown, when many Americans were out-of-work and struggling with the financial, emotional, and health impacts of a once-in-a-century global pandemic, defendants sought to find opportunity to bring themselves personal wealth and fame through fraud.  Within only a period of several months, defendant's scheme grew so large and so fast that they had to transition from a spreadsheet tracking system to a custom web-based solution.  (PSR at ¶ 39.)  The Moores' fraud impacted thousands of victims and inflicted tens of millions in economic damage.  The Moores targeted victims who already had precarious financial situations, and they sought to wring as much money from their victims as possible.

Even after LaShonda Moore was charged in a nine-felony count indictment, she proceeded to engage in aggravated identity theft while subject to pretrial supervision to conceal the charges pending against her from a prospective employer.  And her pattern of

disregard for the law continued even after she pleaded guilty.  (PSR at ¶¶ 48-50.)    Upon the USPO's request to conduct a pre-sentence interview, LaShonda Moore's husband responded on behalf of both defendants that they "will NOT be attending any PSI interview, probation interview, or any other meeting that contradicts [their] lawful filings. Any continued attempts to schedule an interview or enforce an unlawful process will result in a financial penalty of $350,000 per occurrence …." (PSR at ¶ 35.)  The PSR concludes that LaShonda Moore "has not complied with her conditions of pretrial release … [and] has not acted in a way that is considered consistent with acceptance of responsibility." (PSR at ¶ 37.)  For these reasons, a substantial sentence of imprisonment is warranted.

### 3. Affording Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant (18 U.S.C. § 3553(a)(2)(B) and (C))

There is a strong need in this case to impose a sentence that will specifically deter LaShonda Moore from committing fraud upon her release.  LaShonda Moore's ongoing refusal to participate in the most basic post-conviction processes, including participating in a pre-sentence interview and complying with standard conditions of release, illustrates that specific deterrence is necessary in this case.    In the absence of substantial consequences, LaShonda Moore had demonstrated her belief that responsibility will not catch up to her.

There is also a strong need to impose a sentence that generally deters others from perpetuating similar affinity frauds.  Fraudsters ceaselessly target senior citizens, the elderly, and the financially vulnerable through a variety of fraud schemes.  Like the need

to promote respect for the law, a significant custodial sentence in a case such as this will signal to other potential wrongdoers that there are serious consequences for fraud, particularly in the brazen and duplicitous manner such as here.

### B. Supervised Release, Fine, Restitution, Forfeiture, and Mandatory Special Assessment

The government concurs with the USPO's calculation that the Guidelines range for supervised release is 1 to 3 years.  The Government recommends that LaShonda Moore be sentenced to three years of supervised release.   The government also requests that LaShonda Moore be ordered to pay restitution in the amount of $4,323,106.89 (*see* United States' Sentencing Memorandum Regarding Restitution, ECF 116), and a $100 mandatory special assessment.  The government takes no position on the imposition of a fine.

\*     \*     \*

## V.    CONCLUSION

For the above reasons, the government respectfully requests that the Court impose the following sentence as to defendant LaShonda Moore: (i) a sentence 120 months' imprisonment for Count 9 of the Indictment; (ii) three years of supervised release; (iii) restitution in the amount of $4,323,106.89; and (iv) a special assessment of $100.

Date: September 25, 2025

Respectfully submitted,

JAY R. COMBS
ACTING UNITED STATES ATTORNEY

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION
DEPARTMENT OF JUSTICE

_____/s/_____
THEODORE M. KNELLER
Fraud Section Trial Attorney
Department of Justice
D.C. Bar No. 978680
1400 New York Ave., NW
Washington, DC 20530
(202) 514-5799
(202) 514-3708 (FAX)
theodore.kneller@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via the Court's CM/ECF electronic filing to standby defense counsel and mailed to *pro se* defendant LaShonda Moore on September 25, 2025.

_____/s/_____
THEODORE M. KNELLER