IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:23-CR-243-ALM-AGD |
| | § | Judge Mazzant |
| LASHONDA MOORE (01) | § | |
| | § | |
| | § | |
| | § | |

### UNITED STATES' SENTENCING POSITION FOR DEFENDANT LASHONDA MOORE

Defendant LaShonda Moore is an unrepentant fraudster driven by greed, power, and fame.  Together with Marlon Moore, her husband and co-defendant, LaShonda Moore orchestrated and directed a scheme to defraud at least 11,900 victims of millions of dollars for the Moores' personal gain and that resulted in victim losses of more than $30 million.

Throughout the pendency of this case and post-conviction, defendant LaShonda Moore continues to show her brazen disrespect for the Court, outward contempt of the law, and callous disregard for her victims and their suffering at her hand.  LaShonda Moore has repeatedly shown that she has no remorse for her actions.  Absent a meaningful sentence of imprisonment, she will undoubtedly return to a life of crime and fraud.

At trial, the evidence showed that from June 2020 to February 2021, at the peak of the COVID-19 pandemic, the Moores preyed on vulnerable Americans who were struggling to make ends meet during a period of unprecedented economic disruption.  The Moores live-streamed weekly online videos to thousands of victims to promote "Blessings in No Time" or "BINT," their chain referral pyramid scheme.  The Moores falsely promised

"guaranteed," high-yield profits of 800% on a risk-free investment of $1,400.  Leveraging their T.V. celebrity fame, the Moores relied on religious terminology and a shared affinity group—victims' $1,400 payments were "blessings" to other African Americans, the exclusive members of the BINT "community"—to gain their victims' trust.  The Moores knowingly obscured that their fraudulent scheme was illegal and would one day collapse so that they could attract thousands of victims, most of whom were struggling with their day-to-day finances during the COVID-19 lockdown.  Even when it was obvious that the pyramid scheme was collapsing, the Moores continued to lie to victims who demanded their "guaranteed" refunds.  Rather than trying to help, the Moores gaslit anyone who questioned them while they continued to defraud more victims.  As the scheme was failing, the Moores spent the proceeds of their fraud on a luxury destination vacation for more than 25 family members and friends, a lavish birthday party for LaShonda, and a single payment of $446,761.74 to pay off their home mortgage.

Defendant LaShonda Moore was found guilty by a jury of her peers on all counts in the indictment: one count of wire fraud conspiracy (18 U.S.C. § 1349), five counts of wire fraud (18 U.S.C. § 1343); and three counts of money laundering (18 U.S.C. § 1957).

The Presentence Investigation Report, updated on February 4, 2026 (ECF 222) and finalized as of April 8, 2026 (ECF 235), calculated a total offense level of 42 and a Criminal History Category I, resulting in an advisory Guidelines range of 360 months to life.  (ECF 235 at ¶ 86.)  Having considered the factors under 18 U.S.C. § 3553(a), including the need to avoid unwarranted sentence disparities, the U.S. Probation Office recommends a sentence

of 840 months.  (ECF 222 at ¶¶ 100-104; ECF 235 at p. 35.)  Based on the seriousness of the offense, to protect the public from further crimes of the defendant, and to provide just punishment, the government respectfully submits that the Court should sentence LaShonda Moore to a Guidelines sentence of at least 360 months' imprisonment.

# TABLE OF CONTENTS

I.    RELEVANT PROCEDURAL HISTORY ..................................................................... 5

II.    THE OFFENSE CONDUCT ................................................................................... 6

III.    ADVISORY SENTENCING GUIDELINES ........................................................... 9

    A.    The PSR Correctly Applied a 22-Level Enhancement for Loss ........................... 11

    B.    The PSR Correctly Applied a 6-Level Enhancement for 25 or More Victims with Substantial Financial Hardship ..................................................................... 13

    C.    The PSR Correctly Applied a 2-Level Enhancement for Sophisticated Means and a 4-Level Enhancement For Organizer or Leader of Criminal Activity that was Otherwise Extensive ..................................................................... 14

IV.    GOVERNMENT'S SENTENCING RECOMMENDATION ............................... 15

    A.    Term of Custody ..................................................................................... 15

        1.    Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)) ..................................................................... 15

        2.    Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A)) ..................................................................... 17

        3.    Affording Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant (18 U.S.C. § 3553(a)(2)(B) and (C)) ............................................... 18

    B.    Supervised Release, Fine, Restitution, Forfeiture, and Mandatory Special Assessment ..................................................................................... 19

V.    CONCLUSION ..................................................................................... 20

## I.     RELEVANT PROCEDURAL HISTORY

On November 8, 2023, defendants LaShonda Moore and Marlon Moore (collectively, "defendants") were indicted on nine felony counts for wire fraud conspiracy (18 U.S.C. § 1349), wire fraud (18 U.S.C. § 1343), and money laundering (18 U.S.C. § 1957). (ECF 1.) The indictment alleged that the Moores ran the illegal BINT pyramid scheme from defendants' home in Prosper, Texas. *Id.* On January 16, 2025, defendants each pleaded guilty to Count 9 of the Indictment (18 U.S.C. § 1957) pursuant to written plea agreements with the government, which were not binding on the Court. (ECFs 51 & 55.) On January 23, 2025, the Court accepted each defendant's guilty plea to Count 9 of the Indictment and deferred acceptance of the plea agreements until after review of the presentence reports. (ECFs 60 & 61.)

On March 27, 2025, defendants were arrested pursuant to allegations of violating conditions of pre-trial release. (ECF 90.) On April 2, 2025, Magistrate Judge Aileen Goldman Durrett ordered defendants remanded into custody for violating conditions of release and conducted a *Faretta* hearing as to both defendants. Judge Durrett found that each defendant knowingly and voluntarily waived their right to counsel and should be permitted to proceed *pro se*. (ECF 94 & 95.)

On September 30, 2025, the Court held sentencing hearings for each defendant. Each defendant displayed what the government would characterize as a lack of acceptance of responsibility as required by their plea agreements. The Court rejected the plea agreement for each defendant and set trial for January 6, 2026.

On January 8, 2026, after a three-and-a-half-day trial, both defendants were convicted on all nine counts in the Indictment.  On February 4, 2026, the U.S. Probation Office ("USPO") filed the Initial Disclosure Copy of the Presentence Report for LaShonda Moore.  (ECF 222.).  On March 16, 2026, defendant LaShonda Moore filed objections to the Initial PSR.  (ECF 231.)  The government did not file objections.  On April 8, 2026, the USPO filed the Final Presentence Investigation Report for LaShonda Moore.  (ECF 235.) On April 29, 2026, defendant LaShonda Moore filed another *pro se* filing (having already filed at least a dozen *pro se* filings to date) that is captioned "Notice of Termination of Counsel and Revocation of All Authority."  (ECF 239.)  On May 1, 2026, appointed counsel for defendant LaShonda Moore moved to withdraw a counsel.  (ECF 240.)  A *Faretta* hearing is scheduled for June 9, 2026, and the sentencing hearing is scheduled to immediately follow the *Faretta* hearing.

## II.    THE OFFENSE CONDUCT

From June 2020 to February 2021, defendants conspired to create and run an illegal pyramid scheme called "Blessings in No Time" or "BINT."  (*See* ECF 53 at ¶ 3.)  BINT was a fraudulent chain-referral pyramid scheme that targeted victims with false and misleading statements and false promises regarding high-yield returns of 800% and no-risk, guaranteed refunds. (*Id.* at ¶ 4.)  Defendants structured BINT



so that it operated on "playing boards" that had four levels: Fire, Wind, Earth, and Water. (*Id.* at ¶ 5.) Each playing board had eight Fire positions on the outside, four Wind positions closer in, two Earth positions next to the center, and one Water position at the center. (*Id.*) Each BINT participant started in the scheme as a Fire on a board assigned to them. The Fires were directed to "bless" or pay the Water either $1400 or $1425, so that the Water received $11,200 or $11,400 in total. (*Id.*)

Once all Fires paid the Water, then the board split into two, and every Fire moved into a Wind position. Every Wind then had to recruit two new Fires, and, once the new Fires made their payments, the board split again and the Winds moved up to an Earth on their respective new boards. (*Id.*)

Defendants instructed partici-pants in the "Fire" positions to make payments of $1,400 or $1,425 to



participants in the "Water" position using peer-to-peer smartphone payment applications such as CashApp, Venmo, PayPal, and Zelle. (*See* ECF 235 at ¶¶ 22 & 46.) Beginning in August 2020, defendants required BINT participants to pay $85 per month to use an online

web platform (called "Conecmi") to populate playing boards, coordinate payments between Fires and Waters, and to facilitate the splitting of boards.  (ECF 53 at ¶ 8.)

From at least June through November 2020, defendants hosted regular live-streamed video updates for all BINT participants.  The weekly live-stream sessions would regularly host more than 1,000 viewing participants from across the United States.  (ECF 235 at ¶ 20.) During the live-stream videos, which typically lasted an hour or more, defendants would promote the BINT community to existing and prospective participants.  (*Id.*.at ¶ 16.) Defendants encouraged new participants (*i.e.,* "Fires") to promptly make their $1,400 or $1,425 "blessing" payment to the designated person in the Water position on their board, and defendants encouraged participants to recruit new participants exclusively from the black community to be Fires.  (*Id.* at ¶¶ 14 & 17.)

Defendants made repeated false and fraudulent statements to prospective and existing BINT participants about the nature of BINT.  For example, defendants promised participants "guaranteed" 800% returns on their $1,400 or $1,425 investment.  (*Id.* at ¶¶ 29-31.)  Defendants also fraudulently lulled victims into a sense of security and trust by falsely promising guaranteed refunds to any participant who was dissatisfied with the performance of their investments.  (*Id.* at ¶ 16.)  Defendants knew, however, that they were in fact operating an illegal pyramid scheme and that their promises of guaranteed profits and refunds were false.  (*Id.* ¶¶ 27-28.)

In less than a year, defendants recruited at least 11,900 victims to pay into the BINT pyramid scheme. (*Id.* ¶ 18.)  According to defendants' own statements in one weekly video

broadcast, more than $31 million in "blessing" payments had been made to members of the BINT community.  (*Id.* ¶ 14(a).)    More than $31 million is consistent with 12,000 BINT participants each making 1.8 payments (on average) of $1,400.  Numerous victims reported making multiple payments of $1,400 or $1,425.  (*See Id.* at ¶¶ 32(c), (d), (g), (j), (l), (r), (t), (u), (x), (bb) & (cc).)  Many other victims reported investing more than $10,000.  (*Id.* at ¶¶ 32(f), (n), (o), (v), (y), (dd) & (ff).)  Chain-referral pyramid schemes, like BINT, "inevitably collapse as a matter of mathematical operation" because they rely on exponentially adding new participants to pay for earlier-in-time participants.  (*Id.* at ¶ 25.)   In a pyramid scheme like BINT, in which new participants must make a standardized payment amount and recruit two new participants to also make standardized payments, at any one time 87.5% of victims will be in a loss position (*i.e.*, having paid in but received nothing).  (*Id.*)  This percentage of victims in the loss position never goes down because the scheme can only continue if more victims are recruited to join.

## III.    ADVISORY SENTENCING GUIDELINES

Defendant LaShonda Moore was convicted of one count of wire fraud conspiracy and five counts of wire fraud, which are grouped for purposes of the offense level computation.  (ECF 235 at ¶¶ 41-42.)   In addition, defendant LaShonda Moore was convicted of three counts of money laundering (18 U.S.C. § 1957), which are separately grouped. *Id*.  The offense level computation under the money laundering group is higher, and therefore is the applicable offense level of 42.

The offense level is calculated as follows:

| | | |
|---|---|---|
| (i.) | The applicable base offense level calculation is calculated under U.S.S.G. § 2S1.1(a)(1) and includes that the underlying offense of wire fraud, which is calculated under U.S.S.G. § 2B1.1(a)(2) resulting in a base offense level of 7; | +7 |
| (ii.) | The loss was more than $25,000,000 but less than $65,000,000 under U.S.S.G. § 2B1.1(b)(1)(L) resulting in a 22-level increase in offense level; | +22 |
| (iii.) | The offense resulted in substantial financial hardship to 25 or more victims under U.S.S.G. § 2B1.1(b)(2)(C) resulting in a 6-level increase in offense level; | +6 |
| (iv.) | The offense involved sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C) resulting in a 2-level increase in offense level; | +2 |
| (v.) | Defendant was an organizer or leader of a criminal activity that was otherwise extensive resulting in a 4-level increase in offense level under U.S.S.G. § 3B1.1(a); | +4 |
| (vi.) | Defendant was convicted of violating 18 U.S.C. § 1957, resulting in a 1-level increase in offense level under U.S.S.G. § 2S1.1(b)(2)(A); and | +1 |
| (vii.) | Defendant has not demonstrated acceptance of responsibility for the offense and therefore is not eligible for reduction in offense level under U.S.S.G. § 3E1.1. | +0 |
| | **Total:** | **42** |

In making factual determinations at sentencing, the Court is entitled to rely upon the information in the PSR as long as the information bears some indicia of reliability. *United States v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010) (citing *United States v. Shipley*, 963 F.2d

56, 59 (5th Cir.1992)).  Defendant bears the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue. *Scher*, 601 F.3d at 413 (citing *United States v. Washington*, 480 F.3d 309, 320 (5th Cir.2007)).  For the reasons stated below, the Court should adopt the findings in the PSR and apply the resulting offense level increase for each enhancement listed in the PSR.

### A.  The PSR Correctly Applied a 22-Level Enhancement for Loss

The PSR correctly applied a 22-level enhancement for a total loss of more than $25,000,000.[1]  As detailed in the United States' Sentencing Memorandum Regarding Restitution (ECF 116), the government has submitted (for restitution purposes) the names and addresses of 11,915 victims for which the government has both (1) a mailing address, and (2) documented payment amounts into the BINT scheme from that victim.  For victims meeting both criteria, the government seeks restitution in the amount of $4,323,106.89 for victims' actual losses that can be documented.  (*Id*.)  This $4.3 million restitution amount alone establishes a loss of more than $3,500,000 but less than $9,500,000 under U.S.S.G. § 2B1.1(b)(1)(J) resulting in an 18-level increase.  But this drastically undercounts the total amount of victim losses.

The PSR is correct, however, in assessing a 22-level increase under U.S.S.G. § 2B1.1(b)(1)(L) because the loss amount is more than $25,000,000 and, as calculated by the PSR, is at least $31,994,560.  (ECF 235 at ¶ 26.)  Specifically, the PSR calculates that

---

[1] The amount of loss is a factual finding which need only be found by a preponderance of the evidence. *United States v. Simpson*, 741 F.3d 539, 556–57 (5th Cir. 2014). The Court "need only make a reasonable estimate of the loss." USSG § 2B1.1, cmt. n. 3(C).

victims paid at least $32,951,400 in payments of $1,400 or $1,425 into the BINT scheme. (*Id.*)  This number is supported by evidence introduced at trial[2]; is consistent with 12,000 participants making two $1,400 payments on average (as one example, Donna Patterson testified[3] that she made payments of approximately $30,000, which is substantially more); and is consistent with statements made by a BINT employee on one of the video live-stream broadcasts.[4]  The PSR appropriately reduces the calculated payments that are considered "loss" by excluding winning payouts. (*Id.* at ¶ 26.)  Specifically, the PSR relies on the formula provided through expert witness testimony for Professor William Keep at trial.  Professor Keep testified that at any point in time, at least 87.5% of participants would have been in the loss position.[5]  Thus $32,951,400 multiplied by 87.5% is $28,832,475 in victim loss resulting from payments of $1,400 or $1,425 into the BINT scheme.  The PSR also correctly adds an additional $3,162,085 from the Conecmi $85/monthly subscription fees based on evidence presented at trial.[6] Thus, the PSR calculates the loss amount to be **at least $31,994,560** ($28,832,475 in participant "Water" payments plus $3,162,085 from

---

[2] *See, e.g.*, Trial Exhibit 104 (showing a screenshot of the Conecmi webpage listing "Total Blessing Shared: [$]32,951,400"); testimony of Donna Patterson, Tr. Day 1 at p. 184 ("This was the amount that had been blessed into the community, almost $33 million").

[3] Testimony of Donna Patterson, Tr. Day 1 at p. 185.

[4] BINT Employee Victor Green stated in one of the video live-streams that the amount of money in the BINT community was $29 million. (ECF 235 at ¶ 26.)

[5] Testimony of Professor William Keep, Tr. Day 2 at p. 322-325; *see also*, Trial Demonstrative Exhibit 670 at p. 19 (The Total Loss Position stays at 87.5% when there are 2,047 participants or more).

[6] *See, e.g.*, Trial Exhibit 250 (Stripe payment records of $85 to Conecmi and BINT Operations LLC).

Conecmi $85/month fees), which supports a 22-level increase under U.S.S.G. § 2B1.1(b)(1)(L).  (ECF 235 at ¶ 26.)

### B. The PSR Correctly Applied a 6-Level Enhancement for 25 or More Victims with Substantial Financial Hardship

The PSR correctly applied a 6-level enhancement because LaShonda Moore's offense resulted in substantial financial hardship to 25 or more victims.  U.S.S.G. § 2B1.1(b)(2)(C).  The PSR states that at least 32 victims reported suffering substantial financial hardship.  (ECF 235 at ¶¶ 32(a) – 32(ff).)  These victims, primarily via victim impact statements submitted to the government and provided to USPO and defendant, reported financial hardships as a result of investing in BINT that included: (1) becoming insolvent (*id*. at ¶¶ 32(g), (l) & (p)); (2) filing for bankruptcy (*id*. at ¶ 33(o)); (3) substantial losses to retirement funds (*id*. at ¶¶ 32(f), (g), (h), (x), and (dd)); (4) substantial changes to employment by taking on a second job (*id*. at ¶¶ 32(o) & (q)); (5) substantial changes to living arrangements (*id*. at ¶¶ 32(r) & (cc)); and (6) substantial harm to and ability to obtain credit (*id*. at ¶¶ 32(b), (h), (i), (o), (p), (q), (r) & (s)).[7]

---

[7] In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit.  U.S.S.G. § 2B1.1, Application Note 4(F).

**C. The PSR Correctly Applied a 2-Level Enhancement for Sophisticated Means and a 4-Level Enhancement For Organizer or Leader of Criminal Activity that was Otherwise Extensive**

The PSR correctly applied a 2-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C).  To carryout the fraudulent scheme, defendants (i) developed a website (BintApp.com) (ECF 235 at ¶ 20); (ii) contracted with a third-party to develop a web-based payment tracking system (Conecmi) (*id.*); (iii) used a credit card payment processing platform to charge monthly fees (ThriveCart) (*id.*); (iv) hosted weekly videos live-streamed to thousands of BINT victims across the United States (Band App) (*id.*); and (v) employed an 11- to 20-member Admin team to track BINT participants' payments and to coax BINT participants into making their $1,400 payments (*id.* at ¶ 23).  Within an eight-month period, BINT had grown to approximately 12,000 participants and inflicted more than $30 million in victim losses.

Similarly, the PSR correctly applied a 4-level enhancement for leader or organizer of criminal activity that was otherwise extensive under U.S.S.G. § 3B1.1(a).  In assessing whether a defendant is an organizer or leader of criminal activity, the Court should consider factors that include (i) the exercise of decision-making authority, (ii) the nature of participation in the commission of the offense, (iii) the recruitment of accomplices, (iv) the claimed right to a larger share of the fruits of the crime, (v) the degree of participation in planning or organizing the offense, (iv) the nature and scope of the illegal activity, and (vii) the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1 App. Note 4.  In all respects, LaShonda Moore and her co-defendant, Marlon Moore, exercised

decision making authority and control over the BINT enterprise, including controlling the finances, directing employees, and determining who would receive the $11,200 or $11,400 Water blessing payments (or capriciously deny such payments when owed).

## IV.    GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a). *United States v. Rita*, 551 U.S. 338, 348 (2007). Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id*. at 350.

Under 18 U.S.C. § 3553(a)(1), the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. Furthermore, the Court should consider the need for the sentence imposed to: (i) reflect the seriousness of the offense, (ii) promote respect for the law, (iii) provide just punishment, (iv) afford adequate deterrence, (v) protect the public, and (vi) avoid unwarranted sentence disparities. (18 U.S.C. § 3553(a)(2) and (6).)

### A.  Term of Custody

Considering the relevant 18 U.S.C. § 3553(a) factors, a sentence of at least 360 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

### 1.  Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The nature and circumstances of the offense, including LaShonda Moore's history and characteristics, weigh heavily in favor of a significant sentence of imprisonment.  At

the peak of the COVID-19 pandemic, LaShonda Moore preyed on vulnerable Americans who were struggling to make ends meet during a period of unprecedented economic disruption. Moore used BINT to falsely dangle the promise of wealth and financial security for the victims, and for the victims' community. Sadly, LaShonda Moore's false promises proved irresistible to far too many working Americans struggling with their finances during unprecedented layoffs and economic uncertainty, which hit the African-American community particularly hard. LaShonda Moore preyed on victims' fears and anxiety so that she could steal their savings, their retirement funds, and money for their children and grandchildren.

When BINT began to collapse in November 2021, LaShonda and Marlon Moore told their victims not to worry. The Moores lied again about the legitimacy of BINT, falsely promised refunds to those who insisted that they wanted out, and attempted to lull the remaining victims into staying with BINT. But rather than paying the promised refunds, the Moores spent $20,000 of victims' money on a surprise birthday party for LaShonda, and then the couple used victim money to fly more than 25 of their closest friends and family for a getaway vacation to Cabo San Lucas, Mexico. (ECF 235 at ¶ 29.) Near the very end, the Moores wired $446,761.74 of fraudulent proceeds to pay off their mortgage. At the same time, the Moores' scheme inflicted substantial financial hardship on dozens of people who were struggling to pay for basic living expenses. (ECF 235 at ¶ 33.)

### 2. Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A))

A custodial sentence is needed in this case to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The scope of LaShonda Moore's conduct makes plain the seriousness of the offense. The context in which the fraudulent scheme was carried out only underscores the gravity of the offense. During the onset of the COVID-19 lockdown, when many Americans were out-of-work and struggling with the financial, emotional, and health impacts of a once-in-a-century global pandemic, defendants sought to find opportunity to bring themselves personal wealth and fame through fraud. Within only a period of several months, defendant's scheme grew so large and so fast that they had to transition from a spreadsheet tracking system to a custom web-based solution. (ECF 235 at ¶ 39.) The Moores' fraud impacted thousands of victims and inflicted tens of millions in economic damage. The Moores targeted victims who already had precarious financial situations, and they sought to wring as much money from their victims as possible.

Even after LaShonda Moore was charged in a nine-felony count indictment, she proceeded to engage in aggravated identity theft while subject to pretrial supervision to conceal the charges pending against her from a prospective employer. (*Id.* at ¶¶ 36, 61 and 104.) And her pattern of disregard for the law continued even after she pleaded guilty. (*Id.* at ¶¶ 59-61.) Upon the USPO's request to conduct a pre-sentence interview, LaShonda Moore's husband responded on behalf of both defendants that they "will NOT be attending any PSI interview, probation interview, or any other meeting that contradicts [their] lawful

filings. Any continued attempts to schedule an interview or enforce an unlawful process will result in a financial penalty of $350,000 per occurrence ….." (*Id.* at ¶ 34.)  The PSR concludes that since their trial convictions, both defendants participated together "in several interviews on YouTube, providing misleading and false information about the trial, including information about some of the victims of the offense. This has further victimized those victims, placing them in fear of 'doxing,'" (*Id.* at ¶ 104.) For these reasons, a substantial sentence of imprisonment is warranted.

### 3. Affording Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant (18 U.S.C. § 3553(a)(2)(B) and (C))

There is a strong need in this case to impose a sentence that will specifically deter LaShonda Moore from committing fraud upon her release.  LaShonda Moore's ongoing activities post-conviction to publicly denounce her conviction on publicly broadcast YouTube podcasts while she is in custody illustrates that specific deterrence is necessary in this case.  In the absence of substantial consequences, LaShonda Moore had demonstrated her belief that responsibility will not catch up to her.

There is also a strong need to impose a sentence that generally deters others from perpetuating similar affinity frauds.  Fraudsters ceaselessly target senior citizens, the elderly, and the financially vulnerable through a variety of fraud schemes.  Like the need to promote respect for the law, a significant custodial sentence in a case such as this will signal to other potential wrongdoers that there are serious consequences for fraud, particularly in the brazen and duplicitous manner such as here.

**B. Supervised Release, Fine, Restitution, Forfeiture, and Mandatory Special Assessment**

The government concurs with the USPO's calculation that the Guidelines range for supervised release is 1 to 3 years. (*Id.* at ¶ 88.) The Government recommends that LaShonda Moore be sentenced to three years of supervised release.  The government also requests that LaShonda Moore be ordered to pay restitution in the amount of $4,323,106.89 (*see* United States' Sentencing Memorandum Regarding Restitution, ECF 116), and a $900 mandatory special assessment.  The government takes no position on the imposition of a fine.

*       *       *

## V.   CONCLUSION

For the above reasons, the government respectfully requests that the Court impose the following sentence as to defendant LaShonda Moore: (i) a sentence of at least 360 months' imprisonment; (ii) three years of supervised release; (iii) restitution in the amount of $4,323,106.89; and (iv) a special assessment of $900.

Date: June 2, 2026

Respectfully submitted,

JAY R. COMBS
UNITED STATES ATTORNEY

LORINDA I. LARYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

_____/s/_____
THEODORE M. KNELLER
Fraud Section Trial Attorney
Criminal Division
Department of Justice
D.C. Bar No. 978680
1400 New York Ave., NW
Washington, DC 20530
(202) 514-5799
(202) 514-3708 (FAX)
theodore.kneller@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via the Court's CM/ECF electronic filing to defense counsel on June 2, 2026.

_____/s/_____
THEODORE M. KNELLER